[Cite as *State v. Clark*, 2018-Ohio-521.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-17-1044

      Appellee                              Trial Court No. CR0201603039

v.

Marcus L. Clark, Sr                              **DECISION AND JUDGMENT**

      Appellant                             Decided: February 9, 2018

* * * * *

Julia R. Bates, Prosecuting Attorney, and Brenda J. Majdalani, Assistant
Prosecuting Attorneys, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**MAYLE, P.J.**

{¶ 1} Defendant-Appellant, Marcus Clark Sr., appeals the February 21, 2017

judgment of the Lucas County Court of Common Pleas sentencing him for a conviction

of menacing by stalking. For the following reasons, we affirm.

## I. Background and Facts

{¶ 2} On November 8, 2016, Clark was indicted on one count of menacing by stalking, a violation of R.C. 2903.211(A)(1). The indictment included a penalty enhancement under R.C. 2903.211(B)(2)(e) that raised the menacing by stalking charge from a first-degree misdemeanor to a fourth-degree felony and required the state to prove that "[t]he offender has a history of violence toward the victim or any other person or a history of other violent acts toward the victim or any other person." During discovery, the state told Clark's attorney that it intended to rely on two of Clark's prior convictions to prove the history-of-violence element. The state later learned that the prior convictions did not involve B.P., the victim in this case. At a pretrial on January 10, 2017, the state told the defense that the prior convictions involved different victims and that it would not use the convictions to prove the history-of-violence element. Instead, the state intended to rely only on B.P.'s testimony to show that Clark had a history of violence with B.P.

{¶ 3} On January 17, 2017, Clark filed three motions: a request for a bill of particulars, a "motion for notice of intent to use evidence," and a discovery demand. All three motions sought information from the state regarding its ability to prove the history-of-violence element. Clark claimed that he had not been provided with any discovery relating to B.P.'s allegations of past violence. In response, the state asked Detective Mary Jo Jaggers of the Toledo Police Department, who was the detective assigned to the case, to conduct a follow up interview with B.P. Detective Jaggers interviewed B.P. on January 19, 2017, and filed her supplemental report memorializing the interview on January 20, 2017. The state provided the report to Clark on January 23, 2017.

2.

{¶ 4} The court held another pretrial on January 24, 2017, at which Clark moved to dismiss the indictment because of the state's Crim.R. 16 violations, or alternatively, for exclusion of B.P.'s testimony regarding Clark's history of violence with her. The state moved for a continuance of the trial scheduled to begin later that day, which the court granted over Clark's objection. The court also ordered the parties to brief the dismissal issue by January 26, 2017.

{¶ 5} On January 25, 2017, the state filed its responses to Clark's January 17 motions, including a notice of intent to use evidence that outlined B.P.'s anticipated trial testimony. The same day, Clark filed a motion to dismiss that expanded upon the arguments he made at the January 24 pretrial. He argued that the state's failure to provide him with evidence to support the history-of-violence element until the day before trial violated Crim.R. 16 and that the appropriate sanction was either dismissal of the indictment, dismissal of the history-of-violence element of the indictment, or exclusion of B.P.'s testimony regarding the history of violence between her and Clark.

{¶ 6} The state responded on January 26, 2017, arguing that dismissal was not an appropriate sanction because any Crim.R. 16 violation it might have committed was not willful, Clark suffered only minor prejudice, and a continuance of the trial was the least severe remedy for any discovery violation.

{¶ 7} Also on January 26, the court held a hearing on the motion to dismiss. At the hearing, the court tentatively set a new trial date for January 31, 2017. The court did not rule on Clark's January 25 motion, prompting Clark to file a second motion to

3.

dismiss on January 30, 2017. The January 30 motion alleged additional discovery violations by the state. Clark again sought sanctions in the form of dismissal of the indictment or exclusion of B.P.'s testimony regarding the history of violence between her and Clark.

{¶ 8} The court held another hearing on January 30 (the day before the scheduled jury trial) at which it addressed the new motion to dismiss. The court took the issues of dismissal and sanctions under advisement and confirmed the January 31 trial date.

{¶ 9} Prior to trial on January 31, 2017, the court ruled that the state's conduct was not sufficient to justify dismissing the indictment. After confirming with defense counsel that he was ready to proceed with trial, the court decided not to issue any sanctions against the state. The court also noted its continuance of the January 24 trial date to January 31, which provided the defense with additional time to prepare to defend against the evidence in the January 20 police report and therefore remedied any prejudice Clark might have suffered.

{¶ 10} At trial, B.P. was the state's first witness. She testified that she and Clark had lived together and had an eight-year relationship that she ended in August 2016. She described the relationship as "very violent, abusive. A lot of putdowns, a lot of mental abuse." This included death threats, beatings, and abuse of B.P.'s dogs. B.P. said that she stayed in her relationship with Clark for more than eight years because she was scared of him and afraid that he would harm her if she left. Although B.P. testified that there were numerous incidents of abuse that happened during her relationship with Clark, she addressed only four of them in depth.

4.

**{¶ 11}** The first incident happened approximately one month into her relationship with Clark. She said that he strangled her, which left a scar on her neck. B.P. did not call the police or seek medical care because of this incident because she was afraid and did not know what to do.

**{¶ 12}** The next incident of violence that she detailed was a beating in July 2007, during which Clark gave her a black eye. She also said that she received so many black eyes during her relationship with Clark that her left eye looks permanently blackened. Once again, B.P. did not report the incident to police or seek medical attention.

**{¶ 13}** The third incident happened in April 2009. B.P. testified that Clark "stomped my face out" and cut her hand and leg with a knife. B.P.'s injuries were so severe that Clark permitted her to go to the hospital for treatment. B.P. claimed that Clark told her to report that she was injured when a group of men attacked her as she was walking to the store, which she reported to hospital staff. When police officers came to the hospital to investigate, B.P. told them the same story. She testified that there was no follow-up investigation or prosecution based on her police report. She claimed that she did not tell the hospital staff or the police what really happened because Clark had threatened to kill her before and she was afraid of him.

**{¶ 14}** The final incident B.P. detailed happened later in 2009, shortly after B.P.'s mother died. She testified that Clark caused extensive damage to their house one night while he was angry. This included destroying some flowers that had belonged to B.P.'s mother and throwing her mother's picture in the dumpster.

5.

{¶ 15} After B.P. left Clark in August 2016, she testified that he "continuously" made unwanted calls to her work cellphone and sent her unwanted text messages, to the point that she obtained a civil protection order ("CPO") against him to prevent him from contacting her. She also blocked his cellphone number so that she would not receive any phone calls or text messages sent from his number. She took the threats in the text messages very seriously and was "in hiding for months." Clark repeatedly threatened to kill B.P., and she believed that he would follow through on his threats.

{¶ 16} In the afternoon of October 17, 2016, B.P.'s tires were slashed while her car was parked at her office. Her car was the only one in the parking lot that was vandalized. There were no witnesses or video that documented who slashed B.P.'s tires, but B.P. believed that Clark did it in retaliation for her blocking his cellphone number earlier that day. B.P. called the Sylvania Township Police Department ("STPD") to report the damage. Officers responded and took a report, but no charges were filed. B.P. testified that she told police when they responded that she was afraid of Clark and that he was going to get more violent as a result of her involving police.

{¶ 17} Beginning the evening of October 17 and continuing through October 31, 2016, B.P. received multiple text messages on her work cellphone from phone numbers that she did not recognize. Despite the messages coming from unknown numbers, B.P. attributed them to Clark because she knew his speech patterns and he had made similar threats to her before. The messages B.P. received on October 17 included the statements "You are so dead bitch" and "The police can't help you hoe??! [sic]." There was also a

6.

message telling B.P. not to go to her office because "you are gonna [sic] have it bad * * *" and a message that B.P. interpreted as threatening her daughter, grandchildren, and ex-husband. B.P. reported the threatening messages to the police around 11:00 p.m. that night. She said that she never received threatening text messages before she left Clark and has not received any threatening messages since the criminal case against Clark was filed.

{¶ 18} Later, on a Sunday,[1] B.P. received more threatening text messages from the unknown phone number. The messages called her a "Dead bitch," accused her of cheating, and threatened death to B.P. and her daughter.

{¶ 19} The next morning, on Monday, B.P. received messages from the same unknown number that said "Thanks for not being there you will get found [sic]" and "We goin together you my bitch mine [sic]." She testified that Clark came to her office that day, but someone told him that B.P. was not there. She believed that the second message meant that Clark was going to kill her and himself. B.P. said she was "petrified" when she received the messages because Clark "was off in crazy land again."

{¶ 20} On Monday evening, B.P. received six messages from a second phone number that she did not recognize. Among other things, the messages said "Call marcus or dont go to work tomorrow. u cheating on me. [sic];" "Im already dead im not going

---

[1] Other than the October 17, 2016 messages, the text messages that the state admitted into evidence are undated (aside from the labels of "Sunday," "Monday," and "Yesterday") and the state did not ask either B.P. or Detective Jaggers to clarify the dates on which B.P. received the messages.

7.

alone [sic];" and "U wont call so I guess ill c u tomorrow [sic]."  She interpreted the messages to mean that Clark intended to look for her if she did not call him and that he intended to kill her and himself the next day.

{¶ 21} The final message that B.P. testified about came from a third phone number that B.P. did not recognize.  It said, "Police can't help you bitch.  Don't go on Reynolds. we both dead soon.  End of story.  In dead now both of us dead.  this is sam bitch 8to5 [sic]."  B.P. thought that Clark was threatening to come to her office, which is on Reynolds Road, to kill her and himself.  B.P. testified that Clark knew that her work schedule was 8:00 a.m. to 5:00 p.m.  She also said that she knows one person named Sam—her son-in-law—but she did not believe that the message came from him because he was respectful to her and had never spoken to her using threatening language.

{¶ 22} B.P. testified that the text messages made her fear for her life.  She believed that Clark was going to cause her physical harm.  As a result of the abuse inflicted by Clark, B.P. now attends personal and group counseling sessions.  She still feared Clark at the time of trial and believed that he would kill her if he ever had the opportunity.

{¶ 23} On cross-examination, B.P. testified that, prior to the day her tires were slashed, she never called 911, filed a police report or pressed charges against Clark, or sought help from a domestic violence agency or shelter.  She said that she reported the text messages because she "had the strength" and thought that Clark would kill her for leaving him.  She admitted that Clark did not commit any acts of physical violence against her from October 17 to 31.  She also admitted that she left Clark twice, but returned to the relationship because she was not strong enough and did not have the

8.

support she needed to stay out of the relationship. She confirmed that she lied to hospital staff and police regarding the source of her injuries in April 2009 even though she was away from Clark and in the safety of the hospital at the time.

{¶ 24} Regarding the incident where her tires were slashed, B.P. testified that she wanted to file charges against Clark, but the STPD did not pursue the case because the police were investigating the text messages and B.P. had already obtained a CPO against Clark.

{¶ 25} Defense counsel also asked B.P. about the text messages that she received from unfamiliar phone numbers. She testified that she reported the messages to police because of their content and because she thought that 22 messages sent over 15 days was an excessive amount of contact. B.P. again said that she believed that Clark sent the messages based on her prior communication with him. She also said that Clark occasionally referred to himself in the third person while speaking, so B.P. did not find it odd that he would refer to himself as "Marcus" in one of the text messages.

{¶ 26} On cross, B.P. said that she showed Detective Jaggers the text messages that were on her phone during Detective Jaggers's investigation. At the detective's request, B.P. said that she took screenshots of all of the messages she received from October 17 to 31 and emailed them to Detective Jaggers. She said that Detective Jaggers did not, however, ask her to have her phone forensically examined by the TPD. B.P. clarified on redirect that Detective Jaggers looked at the messages on B.P.'s phone and made the screenshots of the messages; B.P. just emailed the screenshots to Detective Jaggers.

9.

**{¶ 27}** Detective Jaggers was the state's other witness. She testified that she is a domestic violence detective with the TPD. She first received a report about the text messages on October 17. The report noted that there was a history of violence between the parties and that B.P. started receiving the messages after she broke up with Clark. Detective Jaggers did not initially interview B.P. After both the TPD and the STPD received more reports from B.P. about threatening text messages, Detective Jaggers conducted an investigation. She interviewed B.P. on October 28, 2016, during which B.P. was very emotional. B.P. told Detective Jaggers about the incidents of violence that B.P. testified to at trial, but Detective Jaggers did not include a description of the events in her report. B.P. also showed Detective Jaggers the text messages on her work phone. Detective Jaggers took screenshots of the messages to preserve them and had B.P. email the screenshots to her; the screenshots that arrived in Detective Jaggers's email (and were admitted into evidence at the trial) were the same screenshots that Detective Jaggers made on B.P.'s phone. Detective Jaggers did not ask B.P. to submit the phone for forensic testing.

**{¶ 28}** Detective Jaggers testified that TPD uses a method of retrieving data from cellphones that she referred to as a "phone dump." The process requires the officer conducting the retrieval to download all of the data on the phone; the officer cannot download only the data that might have evidentiary value. TPD does not have a policy about retrieving cellphone data from victims. Rather, a phone dump is conducted at the investigating detective's discretion and requires the victim to consent to the process. Detective Jaggers chose not to ask B.P. to consent to a phone dump.

10.

{¶ 29} Detective Jaggers also testified that she requested phone records from the cellphone service providers for B.P.'s work phone and the three unknown numbers that the text messages came from, but she was not able to obtain them. She said that neither phone records nor phone dump data could tell her who was holding the phone that sent the messages to B.P.

{¶ 30} Finally, Detective Jaggers said that, based on her knowledge of and experience with domestic violence victims, she did not find it unusual that B.P. did not contact police about the abusive behavior or call 911 when she was injured, stayed with Clark for many years and returned to the relationship after leaving, and lied about the cause of her April 2009 injuries.

{¶ 31} Clark's cross-examination mainly focused on the deficiencies that he perceived in Detective Jaggers's investigation. Detective Jaggers admitted that speaking to B.P. was the extent of her investigation. She did not interview Clark about the text messages either before filing the charges or after Clark was arrested and held in jail, nor did she interview B.P.'s daughter, friends, or neighbors.

{¶ 32} Detective Jaggers confirmed that she learned about the incidents of violence to which B.P. testified during her interview with B.P., but she did not put the incidents in a written report at that time. Detective Jaggers said that she conducted another interview with B.P. on January 19, 2017—11 days before trial—in order to get a comprehensive list of violent incidents between Clark and B.P. She confirmed that B.P.'s failure to report the abuse or leave Clark was not unusual behavior in a domestic

11.

violence victim. She also confirmed that her supplemental report did not note any incidents of violence after 2009 and that Clark did not commit any acts of violence against B.P. from October 17 to 31, 2016. B.P. did not report receiving any threatening text messages between the time she left Clark in August 2016 and the time she received the first threatening message on October 17, 2016.

{¶ 33} Regarding her choice not to collect the data from B.P.'s work cellphone, Detective Jaggers testified that she opted not to request a phone dump because of concerns about the business information on the phone. She believed that preserving the text messages in photographs and subpoenaing phone records would be sufficient evidence. She also admitted that she did not receive any of the phone records that she subpoenaed from the cellphone companies. To follow up on the subpoenas, Detective Jaggers called one of the companies to ask about the records and told prosecutors that she had not received the records. Detective Jaggers was not called into court for a hearing about enforcing the subpoenas. Detective Jaggers said that she did not apply for search warrants for B.P.'s work cellphone or for the cellphones associated with the three unidentified telephone numbers. Without the phone records, Detective Jaggers was not able to identify the people to whom the unknown phone numbers belonged.

{¶ 34} Detective Jaggers testified that there are programs available that allow users to "spoof" phone calls and text messages—i.e., make the calls and messages appear to be coming from a phone number different from the number that was actually calling or sending the messages. She admitted that there was a possibility that the messages B.P. received had been sent from a spoofed number. Although Detective Jaggers said that

12.

calling the phone numbers may have provided insight on who they belonged to and whether the text messages were from spoofed numbers, she did not call any of them during her investigation.

{¶ 35} After hearing the evidence, the jury found Clark guilty of menacing by stalking, including the history-of-violence element. On February 17, 2017, the trial court sentenced Clark to 17 months in prison. Clark now appeals the trial court's judgment, raising three assignments of error:

I. The court committed reversible error when it denied Defendant's Motion to Dismiss or order sanctions against the State for failure to timely provide evidence to be used in the State's case in chief.

II. The state failed to provide legally sufficient evidence to sustain an indictment or conviction for the enhanced offense of menacing by stalking, a felony of the fourth degree.

III. Appellant's conviction for menacing by stalking, a felony of the fourth degree, was against the manifest weight of the evidence.

## II. Law and Analysis

### A. The State did not Commit a Discovery Violation

{¶ 36} In his first assignment of error, Clark contends that the trial court erred when it failed to dismiss the indictment or otherwise sanction the state for discovery violations. Clark claims that the state violated Crim.R. 16 when it decided to rely on evidence to support its case that was different from the evidence it initially disclosed without also providing Clark with the new evidence it intended to use. The state, on the

13.

other hand, argues that (1) it did not commit any discovery violations and (2) if it did, the trial court's continuance of the jury trial from January 24 to January 31 was the appropriate sanction. We agree with the state that no discovery violations occurred.

{¶ 37} "The trial court may make orders regulating discovery not inconsistent with [Crim.R. 16]." Crim.R. 16(L)(1). Generally speaking, when the trial court becomes aware that a party has violated Crim.R. 16, the court can order the party to produce the evidence, grant a continuance, exclude the undisclosed evidence from trial, or "make such other order as it deems just under the circumstances." *Id.* Imposition of discovery sanctions is discretionary, and we review the trial court's decision for an abuse of discretion. *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 20, 33. Abuse of discretion means that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610, 665 N.E.2d 200 (1996).

{¶ 38} Under Crim.R. 16(B), the state has a duty to provide the defendant with certain items related to the defendant's case that are "within the possession of, or reasonably available to the state * * *." Crim.R. 16(B). Among the items the state must disclose are "[a]ll reports from peace officers * * *" and "[a]ny written or recorded statement by a witness in the state's case-in-chief * * *." Crim.R. 16(B)(6), (7). A writing or recording is a "statement" for purposes of Crim.R. 16 if it is prepared, signed, or adopted by the witness, or is a substantially verbatim recital of the witness's statement that is written in narrative form. *State v. Inman*, 4th Dist. Hocking No. 12CA16, 2013-

14.

Ohio-3351, ¶ 26. Although the rule requires the state to disclose witnesses' statements, it does not require the state to reduce interviews with potential witnesses to writing. *State v. Jackson*, 9th Dist. Summit No. 27739, 2017-Ohio-278, ¶ 11.

{¶ 39} Here, it is undisputed that the state provided Clark with Detective Jaggers's initial police report from her October 28, 2016 interview with B.P. and that the report does not contain descriptions of any incidents of violence between B.P. and Clark. It is also undisputed that Clark knew B.P.'s identity and knew that the state planned to call her as a witness. Additionally, Detective Jaggers testified that one of the police reports from STPD (that is not in the record) noted a history of violence between the parties, albeit without detailed descriptions of violent incidents.

{¶ 40} The state initially—and mistakenly—told Clark that B.P. was the victim of Clark's prior violent crimes and that it intended to use the prior convictions to prove a history of violence between him and B.P. The prosecutor disclosed his mistake to Clark when he realized that B.P. was not the victim of the prior crimes. Clark takes issue with the state's failure to provide him with any more discovery information at that time. But it appears from the record that the state did not have anything else to give Clark; there is no evidence that a written or recorded statement by B.P. existed before January 19. When Clark made a discovery request for more specific information about B.P.'s testimony, the state obtained a statement from B.P. and promptly disclosed it to Clark.

{¶ 41} In *State v. Nelson*, 2d Dist. Montgomery No. 25026, 2012-Ohio-5797, a case that involved the state's late disclosure of recently-obtained statements from two codefendants, the Second District Court of Appeals found that the state did not commit a

15.

discovery violation because "the State could not have disclosed the supplemental [police] report prior to [the day before trial], when it was completed * * *." *Id.* at ¶ 46. The court also noted that the defense attorney did not ask for a continuance, but "indicated that he 'absorbed' the materials provided by the State before [the codefendants] testified, and counsel could and did thoroughly cross-examine those witnesses." *Id.*

{¶ 42} Like the Second District in *Nelson*, we find in this case that the state could not have provided Clark with discovery that did not exist when he first asked for it. Clark does not provide any case law—and we could not find any—supporting the idea that the state had a duty to create a witness statement in this case. We also note that the trial court continued the trial for a week, which gave Clark's attorney time to investigate the statements and prepare for trial. Moreover, Clark's attorney said before the trial began that he had all of the information that he needed to proceed, and Clark's attorney was able to thoroughly cross-examine B.P. about the incidents of violence, and Detective Jaggers about the timing and completeness of her investigation. Under these circumstances, we find that the state did not violate Crim.R. 16, and consequently, the trial court did not abuse its discretion in failing to sanction the state. Accordingly, Clark's first assignment of error is not well-taken.

## B. Clark's Conviction is Supported by Sufficient Evidence

{¶ 43} In his second assignment of error, Clark argues that his conviction of the history-of-violence element is not supported by sufficient evidence because B.P.'s testimony about the history of violence should have been excluded and there is no other

16.

evidence supporting a fourth-degree felony conviction. The state counters that B.P.'s testimony was properly admitted and that Clark's conviction was supported by sufficient evidence.

{¶ 44} In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Were,* 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 132. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 45} To prove that Clark committed menacing by stalking, the state was required to prove that Clark engaged in a pattern of conduct by which he knowingly caused B.P. to believe that Clark would cause physical harm to her or her family member or he knowingly caused mental distress to B.P. or her family member. R.C. 2903.211(A)(1). Clark does not argue that the state failed to prove these elements of menacing by stalking. Rather, he claims that the state did not prove that he "has a history of violence toward the victim or any other person or a history of other violent acts toward the victim or any other person," as required by R.C. 2903.211(B)(2)(e) to make the crime a fourth-degree felony. The history-of-violence element can be proven by testimony

17.

alone. *See, e.g., State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 177 (a single witness's testimony is sufficient to prove a fact even if the testimony is contradicted); *State v. Neal*, 6th Dist. Lucas No. L-14-1221, 2016-Ohio-332 (victim's "uncorroborated" testimony provided sufficient evidence to support history-of-violence element).

{¶ 46} We find that the state presented sufficient evidence to prove that Clark has a history of violence and violent acts toward B.P. B.P. testified to four separate incidents where Clark was violent with her: one where he strangled her, one where he blackened her eye, one where he beat her and cut her with a knife, and one where he damaged property in their home. Despite Clark's claims, a victim's testimony—alone—is enough to support a jury's finding that there is a history of violence or history of violent acts. The jury found B.P.'s testimony about the parties' past history credible, and we will not disturb that finding. Further, because we found that the trial court did not abuse its discretion by not striking B.P.'s testimony about the violent incidents, Clark's argument that the state lacked sufficient evidence to obtain a conviction without B.P.'s testimony is moot. We find, therefore, that Clark's second assignment of error not well-taken.

## C. Clark's Conviction is not Against the Manifest Weight of the Evidence

{¶ 47} In his final assignment of error, Clark contends that his conviction is against the manifest weight of the evidence. We disagree.

{¶ 48} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences,

18.

consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172*,* 175, 485 N.E.2d 717 (1st Dist.1983). Although under a manifest weight standard we consider the credibility of witnesses, we extend special deference to the jury's credibility determinations given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

{¶ 49} After reviewing the evidence and the credibility of the witnesses, we are not convinced that the evidence weighs heavily against Clark's conviction. Nor can we say that the jury lost its way or created a manifest miscarriage of justice by convicting Clark of felony menacing by stalking. We find, therefore, that Clark's conviction is not against the manifest weight of the evidence. Accordingly, Clark's third assignment of error is not well-taken.

19.

### III. Conclusion

**{¶ 50}** The February 21, 2017 judgment of the Lucas County Court of Common Pleas is affirmed.  Clark is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.      _____
                                           JUDGE

Thomas J. Osowik, J.

_____
                                           JUDGE

Christine E. Mayle, P.J.     
CONCUR.

_____
                                           JUDGE